IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAWN GARDNER, Individually and as          :
Administratrix of the Estate of Charlene   :
Kim Dewitt a/k/a Charlene De Witt Keller,  :
Deceased, REBECCA JANE THOMPSON,           :
Custodian and Next Friend on behalf of     :
R.E.D.T. a Minor                           :
                    Plaintiffs             :
                                           :
      v.                                   :   3:CV-07-1947
                                           :   (JUDGE VANASKIE)
LUZERNE COUNTY, LUZERNE COUNTY             :
DISTRICT ATTORNEY'S OFFICE, DAVID          :
W. LUPAS, Individually and in his Official :
Capacity as District Attorney of Luzerne   :
County, GREGORY E. FELLERMAN,              :
Individually and in his Official Capacity  :
as Luzerne County Assistant District       :
Attorney, JANE/JOHN DOE I AND II           :
Individually and in their Official Capacity :
as Assistant District Attorneys, JOHN/     :
JANE DOE III AND IV Individually and in    :
their Official Capacity as Professional    :
Personnel and Officers of Luzerne          :
County Assistant District Attorney's       :
Office, FREDERICK NICHOLS, JR.             :
Individually and in His Official Capacity  :
as Constable/Police Officer, OFFICE OF     :
THE ATTORNEY GENERAL                       :
COMMONWEALTH OF PENNSYLVANIA               :
Pharmaceuticals                            :
                    Defendants             :

MEMORANDUM

This case presents an unusual factual scenario that raises questions concerning the potential liability of state prosecutors where they impede the timely disposition of criminal charges and the defendant is murdered by a known threat to her safety before the defendant can plead guilty and re-locate to another jurisdiction.  Plaintiffs Dawn Gardner, individually and as administratrix of the Estate of Charlene Kim Dewitt, deceased, and Rebecca Jane Thompson, custodian and next friend on behalf of R.E.D.T., a minor, bring this action against Luzerne County, the Luzerne County District Attorney's Office, former District Attorney David W. Lupas, and Assistant District Attorney Gregory E. Fellerman (collectively, the Luzerne County Defendants).[1]  Plaintiffs allege that Defendants violated the First, Fourth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution by (a) postponing Ms. DeWitt's plea hearing; (b) imposing bail bond restraints on Ms. DeWitt while knowing of the danger posed by Ms. DeWitt's former domestic partner, and (c) failing to execute a warrant for the arrest of Ms. DeWitt's former domestic partner.

Before the Court is the Luzerne County Defendants' Motion to Dismiss Plaintiff's

---

[1]Plaintiffs originally named the Office of the Attorney General of Pennsylvania and Constable/Police Officer Frederick Nichols, Jr. as Defendants, but have stipulated to their dismissal.  (Dkt. Entries 38 & 57.)

2

Amended Complaint.[2]  (Dkt. Entry 17.)[3]  Because Plaintiffs are unable to present a viable claim for denial of any constitutional right under the unique factual scenario presented in this matter, the Luzerne County Defendants' Motion to Dismiss will be granted.

## I.  BACKGROUND

George Fink, Sr., the domestic partner of Ms. DeWitt, allegedly forced Ms. DeWitt, under a threat of bodily injury, to use and possess cocaine on May 13, 2005.  (Amended Complaint, Dkt. Entry 5, ¶ 19.)  Then, while Ms. DeWitt was driving her vehicle on the highway, Mr. Fink deliberately smashed into her vehicle with his own vehicle, forcing her off the highway.  (Id.)  Mr. Fink's alleged objective was to silence Ms. DeWitt, or at least ensure she stayed under his watch.  (Id.)

As a result of the accident, Ms. DeWitt was brought to the police station and charged with drug possession and motor vehicle violations.  (Id. at ¶ 20.)  While at the police station, she made certain admissions.  (Id.)  She ultimately signed a standard bail bond agreement for release on her own recognizance on June 20, 2005, which Plaintiffs claim limited her ability to

---

[2]Plaintiffs have filed a Motion for Leave to File a Second Amended.  (Dkt. Entry 68.)  I have reviewed the Second Amended Complaint and find that it does not cure the defects of the previous Amended Complaint.  Therefore, Plaintiffs' Motion will be denied.

[3]For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's electronic record and to authority cited herein have been created.  No endorsement is intended by the insertion of hyperlinks to a particular provider of authority in electronic format.

move to another residence.[4]  (Id.)

Mr. Fink was also prosecuted in connection with the May 13, 2005 incident.  He, too, was released on his own recognizance.  (Criminal Docket, Commonwealth v. Fink, CP-40-CR-0002183-2005, at 6 (Pa. Common Pleas Ct., Lackawanna County, 2005.)  Almost four months later, on October 4, 2005, Mr. Fink pled guilty to criminal charges stemming from the May 13, 2005 accident.  (Id. at ¶ 21.)  He remained released on his own recognizance pending sentencing.

Ms. DeWitt apparently served as a witness for the state.  (Id.)  Ms. DeWitt also served as a witness against Mr. Fink for his alleged stalking and harassment of her on July 25, 2005.  (Id. at ¶ 22.)

While Mr. Fink awaited sentencing, Ms. DeWitt obtained a Protection From Abuse ("PFA") Order from the court on December 5, 2005.  Plaintiffs allege that Defendants knew of Mr. Fink's history of violent attacks on domestic partners, and that he would attempt to kill Ms. DeWitt.  (Id. at ¶ 24.)  It is also alleged that Defendants failed to effect an indirect criminal contempt capias issued for Mr. Fink on January 9, 2006.  (Id.)

On October 27, 2005, Ms. DeWitt had a plea hearing scheduled, and intended to plead guilty to the misdemeanor charges resulting from the May 13, 2005 accident, pay a fine, and

---

[4]At Oral Argument, Plaintiff's counsel specified that Ms. DeWitt's bail bond agreement restricted her from changing residences without notification.  (Oral Argument Tr., Dkt. Entry 72, at 14.)

request to be released from her pretrial restrictions so she could protect herself from Mr. Fink. (Id. at ¶ 25.) The proceeding was rescheduled, however, because Defendant Luzerne County Assistant District Attorney Gregory E. Fellerman represented her in a personal injury claim against Mr. Fink arising out of the May 13, 2005 accident. (Id.) Since the Luzerne County District Attorney's office was prosecuting the case, there was a conflict of interest. (Id.)

The court rescheduled the plea hearing for January 10, 2006. (Id.) Plaintiffs claim Ms. DeWitt never knew the reason for rescheduling of the plea hearing. (Id.) When the date of the hearing arrived, the court found that the same conflict of interest persisted, so the court again rescheduled the plea hearing for a later date. (Id. at ¶ 27.) In the interim, Ms. DeWitt made repeated requests to move to Florida in order to protect herself from Mr. Fink. (Id. at ¶ 28.)

Mr. Fink failed to appear for his sentencing in connection with the May 13, 2005 accident, scheduled for January 9, 2006, so the court issued a bench warrant for his arrest on January 20, 2006. (Id.) On January 21, 2006, Mr. Fink attacked Ms. DeWitt, causing her death. (Id. at ¶ 30.)

Plaintiffs have alleged thirteen counts of relief in their seventy-page Amended Complaint. Plaintiffs' First Claim for relief is premised upon the Substantive and Procedural Due Process Clauses of the Fourteenth Amendment, the Eighth Amendment, the First Amendment right to petition the Government for a redress of grievances, the Privileges and Immunities Clause of Article Four, the Fourteenth Amendment right of access to courts, the Fourth Amendment right against unreasonable searches and seizures, the Sixth Amendment right to a speedy trial, and

the right to travel under the Privileges and Immunities Clause.  (Id. at pp. 17 - 31.)  Plaintiffs

contend that Defendants violated Ms. DeWitt's Substantive Due Process rights by: delaying the

operation of a bench warrant; delaying an indirect criminal contempt capias; creating a conflict of

interest by allowing assistant district attorneys to represent plaintiffs in civil claims that are

simultaneously being prosecuted criminally; delaying the withdrawal of an attorney with a conflict

of interest; delaying Ms. DeWitt's plea hearing with knowledge that she was targeted for abuse;

compelling Ms. DeWitt to remain in the jurisdiction with her attacker; delaying the operation of a

PFA order; and denying Ms. DeWitt's request to leave the jurisdiction.  (Id. at ¶ 32(a)-(t).)

According to Plaintiffs, Defendants alleged conduct "shocks the judicial conscience" and is not in

furtherance of any legitimate governmental interest.  (Id. at ¶ 33.)

        Defendants are alleged to have violated the Procedural Due Process Clause of the

Fourteenth Amendment by confining Ms. DeWitt's physical movement and depriving her of

protection.  (Id. at ¶ 37(a)-(f).)  Plaintiffs allege Defendants also violated the Eighth Amendment

by subjecting Ms. DeWitt to cruel and unusual punishment in exposing her to lethal danger and

demanding continued compliance with her bail bond restraints.  (Id. at ¶ 39(a)-(c).)  Defendants

are alleged to have violated the First Amendment, the Privileges and Immunities Clause of

Article Four, and the Fourteenth Amendment for depriving Ms. DeWitt of the opportunity to plead

guilty and to access judicial relief.  (Id. at ¶ 40(a)-(c).)  Plaintiffs allege that Ms. DeWitt's Fourth

Amendment right against unlawful seizures was violated by Defendants in mandating

6

compliance with travel restraints in light of the imminent danger.  (Id. at ¶ 41(a)-(c).)  The Sixth Amendment right to a speedy trial was allegedly violated in Defendants depriving Ms. DeWitt of the opportunity to plead guilty and to have a timely adjudication.  (Id. at ¶ 42(a)-(c).)  Finally, Plaintiffs allege violations of the Right to Travel of the Privileges and Immunities clause by precluding Ms. DeWitt from traveling to Florida.  (Id. at ¶ 43(a)-(c).)

Plaintiffs' Second Claim for relief, against former District Attorney David Lupas, alleges constitutional violations pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978).  Mr. Lupas is alleged to have willfully and deliberately, with reckless indifference, adopted policies and customs in his role as supervisor that: delayed the processing of the bench warrant and indirect criminal contempt capias for Mr. Fink; created a conflict of interest resulting in disqualification from Ms. DeWitt's criminal matter; delayed Ms. DeWitt's plea of guilty; required Ms. Dewitt to notify the court upon a change in residence; delayed the indirect criminal contempt proceeding; did not allow for the flow of information through the office; and failed to minimize the danger to Ms. Dewitt.  (Am. Compl. at ¶¶ 46(a)-(j) & 47(a)-(n).)  These allegations are also alleged in the context of a purported failure to train or supervise the District Attorney's staff.  (Id. at ¶ 47(a)-(l).)

Plaintiffs' Third Claim for relief presents allegations under the same amendments and articles of the United States Constitution as the First Claim for relief, except only Luzerne County is named as the Defendant.  (Id. at 44.)  Plaintiffs allege that Luzerne County had ineffective

policies for handling cases such as this one, failed to properly train and supervise its personnel, failed to discipline its personnel, and tolerated a policy of providing inadequate protective services.  (Id. at ¶ 50(a)-(h).)  Plaintiffs allege that these policies "shock the conscience" and did not further a legitimate governmental interest.  (Id. at ¶ 51.)  Plaintiffs aver that Luzerne County's policies and practices constitute cruel and unusual punishment under the Eighth Amendment because Ms. DeWitt was exposed to lethal danger and required to remain in close proximity to Mr. Fink.  (Id. at ¶ 53(a)-(c).)

Plaintiffs contend that in allegedly depriving Ms. DeWitt of an opportunity to plead guilty, Luzerne County violated her access to judicial relief under the First Amendment, the Privilege and Immunities Clause of Article Four, and the Fourteenth Amendment.  (Id. at ¶ 54(a)-(b).) Plaintiffs likewise allege that Luzerne County violated the Fourth Amendment by precluding her from leaving the area and mandating compliance with bail restrictions.  (Id. at ¶ 55(a)-(c).) Luzerne County is alleged to have violated Ms. Dewitt's right to travel and right to a speedy trial under the Sixth Amendment for the same reasons mentioned previously.  (Id. at ¶¶ 56 & 57.)

Plaintiffs' Fourth Claim for relief, which alleges Mr. Nichols violated certain constitutional rights of Ms. DeWitt, has been withdrawn.  (Stipulation of Dismissal, Dkt. Entry 57.)  The Fifth Claim is premised upon the right of familial relationships guaranteed by the Fourteenth Amendment and the First Amendment.  (Id. at 54.)  According to the Amended Complaint, all Defendants violated the rights of "Dawn Gardner and her minor sister," causing them to suffer

severe emotional distress.  (Id. at ¶ 67.)

The Sixth Claim, asserted against the Office of the Attorney General of the Commonwealth of Pennsylvania, is no longer at issue as Plaintiff Dawn Gardner has agreed to dismiss it from this action.  (Stipulation, Dkt. Entry 38, at 1.)  The Seventh Claim rests upon provisions of the Pennsylvania Constitution that parallel the provision of the United States Constitution upon which Plaintiffs' federal law claims are premised.  (Id. at 57.)  Specifically, Plaintiffs allege violations of Article 1 Sections 1, 26, and 28 of the Pennsylvania Constitution.  (Id. at ¶¶ 71-73.)

The Eighth Claim sets forth a wrongful death claim under 42 Pa. Cons. Stat. § 8301.  (Id. at ¶ 77.)  Plaintiffs assert Defendants' conduct was a substantial cause in Ms. DeWitt's death.  (Id.)  The Ninth Claim asserts a survival action pursuant to 20 Pa. Cons. Stat. § 3373 and 42 Pa. Cons. Stat. § 8302 for damages, pain and suffering, and loss of gross earning power.  (Id. at ¶¶ 82-83.)

The last four claims concern only Defendant Fellerman.  The Tenth Claim for relief avers a professional liability claim.  (Id. at 62.)  Plaintiffs assert that Mr. Fellerman was aware of the May 13, 2005 accident and subsequent criminal charges, and deviated from acceptable professional standards by failing to resign as assistant district attorney following the October 27, 2005 scheduled plea hearing, or by not expeditiously addressing the conflict after his disqualification.  Rules of Professional Conduct 1.7, 1.16 and 1.18 are also alleged to have been

violated.  (Id. at ¶88(a)-(f).)

The Eleventh Claim alleges that Mr. Fellerman breached his fiduciary duty by failing to resolve his conflict of interest while representing Ms. DeWitt in her civil claim.  (Id. at ¶ 91.)  His alleged omission was a substantial cause in Ms. DeWitt's death.  (Id. at ¶ 95.)  The Twelfth Claim presents a wrongful death claim pursuant to 42 Pa. Cons. Stat. § 8301 for Mr. Fellerman's alleged misconduct – an alleged substantial factor in Ms. DeWitt's death.  (Id. at ¶¶ 97-99.)  The Thirteenth Claim is a survival action pursuant to 42 Pa. Cons. Stat. §§ 3373 and 8302 for damages, pain and suffering, and loss of gross earning power.

## II.  DISCUSSION

### A.  Standard of Review

The Court's task on a motion to dismiss is to "determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief . . . ."  Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000).  In doing so, all factual allegations and all reasonable inferences drawn therefrom are assumed to be true.  Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

Dismissal of a complaint is appropriate only if, accepting as true all facts alleged, Plaintiff has not plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007) (abrogating the "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46, 78 (1957)).  As a result of Twombly,

Plaintiffs must now nudge their claims "across the line from conceivable to plausible." Id.  To

state a claim consistent with the language of Fed. R. Civ. P. 8(a)(2), which requires only a "short

and plain statement of the claim showing that the pleader is entitled to relief," a complaint must

contain factual allegations enough "to raise a right to relief above a speculative level." Id.  Each

of the federal law claims asserted in the Complaint will be assessed in the context of this

standard of review.

B.  The Fourteenth Amendment Due Process Claim

The gist of Plaintiffs' due process claim is that Defendants breached an obligation to

protect Ms. DeWitt from Mr. Fink. (Defs.' Br. Supp. Mot. Dismiss, Dkt. Entry 21, at 10.)  In

DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the

Supreme Court of the United States concluded that the Due Process Clause of the Fourteenth

Amendment of the United States Constitution does not generally impose an affirmative obligation

on the state to protect its citizens:

> The Clause is phrased as a limitation on the State's power to act, not as a
> guarantee of certain minimal levels of safety and security. It forbids the State
> itself to deprive individuals of life, liberty, or property without "due process of
> law," but its language cannot fairly be extended to impose an affirmative
> obligation on the State to ensure that those interests do not come to harm
> through other means. Nor does history support such an expansive reading of
> the constitutional text.

489 U.S. at 195-196.  In so concluding, the Supreme Court nonetheless recognized a State's

duty to protect in limited circumstances:

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . .  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id. at 199-200 (internal citations omitted).  The Court held that while state actors may have been aware of the dangers that the child faced when they returned him to the custody of his natural father, they had played no part in the creation of the danger and had not made him more vulnerable to the danger.  Id. at 201.  The Court then suggested that there may be a due process claim if the state actors play a part in creating the danger confronted by the victim or increased the victim's vulnerability to those risks.  Id. at 201-202.

In the wake of DeShaney, our Court of Appeals has framed two situations were states have a constitutional duty to protect a citizen – the existence of a special relationship between the state and the victim and a state-created danger to the victim.  As to the first situation, "it is only when the state takes custody of a citizen, thereby depriving him of his liberty, that it assumes an affirmative duty to protect him or her from harm."  Bright v. Westmoreland County, 443 F.3d 276, 280 (3d Cir. 2006).  Thus, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  DeShaney,

489 U.S. at 200.

A state-created danger comprises four elements:  (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that 'the plaintiff was a foreseeable victim of the defendant's acts,' or a 'member of a discrete class of persons subjected to the potential harm brought about by the state's actions,' as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.  Bright, 443 F.3d at 281.

Plaintiffs assert that liability may be premised upon either the special relationship or the state-created danger theory.  Defendants contend that neither doctrine is applicable here.

i. Special Relationship

An affirmative duty to protect may arise from a limitation which a state has imposed on an individual's freedom to act on his or her own behalf through incarceration, institutionalization, or another similar restraint of personal liberty.  DeShaney, 489 U.S. at 200.  In Collins v. City of Harker Heights, Texas, 503 U.S. 115, 127-28 (1992), the court listed situations where the Due Process Clause imposes an affirmative obligation to "take care of those who already have been deprived of their liberty" – pretrial detainees, persons in mental institutions, convicted felons, and persons under arrest.  Collins held that the Due Process Clause did not extend to impose an

affirmative obligation on municipalities to provide minimal levels of safety and security in the workplace. Id. In other words, the mere existence of some relationship between the state and the victim is not enough to impose constitutionally-based standards of conduct. Instead, it is only where the state has restricted the claimant's "freedom to the extent that she was prevented from meeting her basic needs" that the requisite duty-producing relationship is created. D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364, 1372 (3d Cir. 1992).

Ms. DeWitt claims the conditions of her ROR bail suffice to create the duty-producing special relationship between her and the state. Plaintiff, however, does not cite any case authority for this proposition, and the logic of the cases addressing the special relationship theory compel rejection of this claim.

In Collins, an employee in the sanitation department of the City of Harker Heights, Texas, died while attempting to clear a sewer line. 503 U.S. at 118. The petitioner, his widow, argued "that the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security." Id. at 118. The court rejected petitioner's argument, reasoning that the petitioner cannot maintain that the city deprived Mr. Collins, the employee, of his liberty when it made, and he voluntarily accepted, an offer of employment. Id. at 128.

In this action, it appears that Ms. DeWitt voluntarily entered into her bail bond agreement. See Pa. R. Crim. P. 525(A) ("A bail bond is a document whereby the defendant agrees that while at liberty after being released on bail, he or she will appear at all subsequent proceedings as

14

required and comply with all the conditions of the bail bond.") (emphasis added).  In fact, her

signing of the bail bond enabled her to be released from custody.  Otherwise, she would have

stayed in the custody of the state.[5]  See Pa. R. Crim. P. 525(F) ("The defendant shall not be

released until he or she signs the bail bond.").  Ms. DeWitt entered the bail bond on her own

accord, and does not allege to have been forced to sign the agreement.  Under these

circumstances, it cannot be said that the state intentionally deprived Ms. DeWitt of the ability to

care for herself.  See Cherry v. City of Phila, No. Civ.A. 04-1393, 2004 WL 2600684, at *4 (E.D.

Pa. Nov. 15, 2004) (finding a special relationship did not exist where the plaintiff claimed she was

placed in a witness relocation/protection program, but did not allege that she was not free to

leave that program).[6]

Nor did the state's agreement to release Ms. DeWitt on her own recognizance establish a

duty-producing relationship.  "[T]here is no constitutional right to be deprived of liberty." Wilson v.

Formigoni, 42 F.3d 1060, 1066 (7th Cir. 1994).

Ms. DeWitt's situation, a person out of prison on bail awaiting a plea hearing, is not

sufficiently analogous to other situations where courts have found a special relationship, such as

---

[5]Plaintiff's counsel stated that Ms. DeWitt could have stayed in jail, or custody of the state, if she wanted.  (Oral Argument Tr., Dkt. Entry 72, at 9.)

[6]It is doubtful that Defendants in the case set the conditions of the bail bond.  Pursuant to Pa. R. Crim. P. 525(B), "the bail authority shall (1) have the bail bond prepared; and (2) sign the bail bond verifying the conditions the bail authority imposed."

an incarcerated prisoner or child in foster care, "where the state itself has limited the individuals'

ability to care for themselves." Shrum v. Kluck, 249 F.3d 773, 781 (8th Cir. 2001). In Nicini v.

Morra, 212 F.3d 798, 808 (3d Cir. 2000), which held that "when the state places a child in

state-regulated foster care, the state has entered into a special relationship with that child which

imposes upon it certain affirmative duties," the court explained:

> A relationship between the state and foster children arises out of the state's
> affirmative act in finding the children and placing them with state-approved
> families. By so doing, the state assumes an important continuing, if not
> immediate, responsibility for the child's well-being. In addition, the child's
> placement renders him or her dependent upon the state, through the foster
> family, to meet the child's basic needs.

Id. at 808 (citing D.R. by L.R., 972 F.2d at 1372). "Foster children, like the incarcerated or the

involuntarily committed, are 'placed . . . in a custodial environment . . . [and are] unable to seek

alternative living arrangements.'" Id. (citing Taylor v. Ledbetter, 818 F.2d 791, 795 (11th

Cir.1987) (en banc)).

Here, by way of contrast, a dependent relationship is not present.  While on bail, Ms.

DeWitt did not depend on the state for her basic needs, nor was the state responsible for her

immediate and continual well-being.[7]

---

[7]The added averments of the proposed Second Amended Complaint – that
"quasi-custodial constraints, restraints and restrictions stemming from combined ROR bail bond,
State's witness and PFA/ICC mandates" rendered Ms. DeWitt more vulnerable to lethal attack,
(Dkt. Entry 68-3 at 4) – do not suffice to establish a dependent relationship of the type that would
impose upon the state an affirmative obligation to protect Ms. DeWitt.  Essentially, Plaintiffs

The state's knowledge of Ms. DeWitt's purported dangerous situation does not compel the finding of a special relationship.  Just as the respondents in <u>DeShaney</u> had knowledge of the father's violent behavior, Defendants in this case are alleged to have possessed knowledge of Mr. Fink's previous violent conduct.  A State's knowledge of an individual's predicament, however, does not create an affirmative constitutional duty.  It has consistently been held that the state's knowledge of the danger confronting a person does not impose on the state any affirmative duty to protect that person .  <u>See</u>, <u>e.g.</u>, <u>DeShaney</u>, 489 U.S. at 197, 198 ("We reject [the] argument . . . that such a 'special relationship' existed here because the State knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger."); <u>Graham v. Independent Sch. Dist. No. I-89</u>, 22 F.3d 991, 995 (10th Cir. 1994) ("[B]ecause no special relationship existed between the plaintiffs and defendants, defendants' alleged nonfeasance in the face of specific information which would mandate action does not invoke the protections of the Due Process Clause"); <u>Foy v. City of Berea</u>, 58 F.3d 227, 231 (6th Cir. 1995) ("Mere knowledge of danger to the individual does not create an affirmative duty to protect.").

A State is simply not obliged to be a guarantor of an individual's safety.  In short, there was no "special relationship" between Defendants and Ms. DeWitt because she was not in the

----

complain that Ms. DeWitt was compelled to remain in Pennsylvania, but that restriction does not equate to an inability on the part of Ms. DeWitt from taking care of or protecting herself.

state's custody or control, and the state's alleged knowledge of Mr. Fink's propensity for violence does not create one.[8]

Plaintiffs argue that a quasi-custodial relationship was created by the bail bond restraint, relying on Jacobs v. Ramierez, 400 F.3d 105 (2d Cir. 2005).  (Oral Argument Tr., Dkt. Entry 72, at 9.)  In Jacobs, pro se Plaintiff Alonzo Jacobs, a parolee under the supervision of the New York State Division of Parole, brought a claim under 42 U.S.C. § 1983, alleging "that the defendant parole officers violated Jacobs's civil rights by paroling him to his mother's unsafe and unsanitary residence [and] refusing his request to relocate to a homeless shelter . . . ."  Id. at 105.  Applying the "no set of facts" standard articulated in Conley v. Gibson, 355 U.S. 41 (1957), and recognizing the liberal construction of the allegations afforded to pro se plaintiffs, the Second Circuit reversed the district court's sua sponte dismissal of the plaintiff's § 1983 claim "with respect to the state's decision to parole him to allegedly unsuitable housing and its alleged refusal to allow him to move. . . ."  Id. at 107.  The Court found that, in agreeing to parole Jacobs to the home to which he sought to be paroled, "the state assumed the very limited duty of ensuring that it did not require him to remain in a place that turned out, at least according to his allegations, to be uninhabitable."  Id.  Hence, the court concluded that "because Jacobs alleges

---

[8]Plaintiff's reliance on Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 300 (1984), is misplaced as the court was concerned with allowing persons, who had been convicted in state court and had exhausted all available state court opportunities, federal habeas corpus relief when out on bail on personal recognizance (not in actual, physical custody).  A state's duty to protect under the Fourteenth Amendment was not at issue in that case.

that the state effectively compelled him to live in unsafe conditions, we cannot conclude 'beyond doubt' that he 'can prove no set of facts' that would entitle him to relief." Id.

Even if the Third Circuit recognized a quasi custodial relationship as a type of duty-producing special relationship under the Fourteenth Amendment, the allegations in this case would not be sufficient to find one. Ms. DeWitt was not compelled to live in any particular residence. She could change her residence so long as she informed the court's representative. While she may have been unable to travel outside Pennsylvania, this condition does not suffice to impose upon the state an affirmative obligation to protect her.

Plaintiffs assert that Ms. DeWitt was compelled to sign the bail bond agreement, but this conclusory allegation, without more, is insufficient to support a due process claim based upon a "special relationship" with the state. See Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) ("Rule 8 requires a showing, rather than a blanket assertion, of entitlement to relief.") (internal citations omitted). As previously mentioned, there are no allegations specifying that Defendants engaged in fraud, coercion, or undue force. Nor do the allegations address the details of the bail bond agreement or the exchange that took place when Plaintiff entered into the agreement.

Indeed, Plaintiff's allegations of "compulsion" are belied by her counsel's statements that she could have stayed in jail, or custody of the state, if she wanted. (Oral Argument Tr., Dkt. Entry 72, at 9.) Her counsel further stated that she never attempted to modify her bail bond

agreement.  (Oral Argument Tr., Dkt. Entry 72, at 13.)   In short, Plaintiff's allegations do not rise

above the speculative level, and cannot support a finding of a duty-producing "special

relationship" with the state.  See Phillips, 515 F.3d at 232 ("[A] complaint's factual allegations

must be enough to raise a right to relief above the speculative level.").

### ii.  State Created Danger

Contesting the existence of the first and fourth elements of the state-created danger

doctrine,[9] Defendants argue that Ms. DeWitt's death was not a foreseeable consequence of the

delay in her plea hearing date and that it did not engage in any affirmative acts to expose her to

danger.[10]  (Defs.' Br. Supp. Mot. Dismiss, Dkt. Entry 21, at 14 & 15.)  Because Plaintiffs cannot

---

[9]As noted above, there are four elements to a state-created danger case: (1) the harm
ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of
culpability that shocks the conscience; (3) a relationship between the state and the plaintiff
existed such that 'the plaintiff was a foreseeable victim of the defendant's acts,' or a 'member of
a discrete class of persons subjected to the potential harm brought about by the state's actions,'
as opposed to a member of the public in general; and (4) a state actor affirmatively used his or
her authority in a way that created a danger to the citizen or that rendered the citizen more
vulnerable to danger than had the state not acted at all.  Bright, 443 F.3d at 281.

[10]Plaintiffs assert that their claims are a product of the "following compounding factors":

(1) fostered "conflicts" precluding plea and "safe haven"; (2) needlessly and
recklessly prolonged and uncured; (3) with deliberate obstruction of
processing/issuance of bench warrant and criminal contempt capias for her "on the
lam" attacker; and (4) continued bogus insistence on Plaintiffs' decedent's
presence.

(Pl.'s Br. Opp'n, Dkt. Entry 22, at 13-14.)

show as a matter of law that any Defendant took affirmative actions to expose Ms. DeWitt to danger or took affirmative actions that rendered her vulnerable to Mr. Fink, the Defendants' objection to the first element will not be considered.

To present a viable state-created danger claim, Plaintiffs must show that "state authority was affirmatively exercised," Bright, 443 F.3d at 282, meaning that "the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." Id. at 283 (internal citations omitted).  Our Court of Appeals has emphasized that "'state actors' cannot 'use their authority' to create such an opportunity by failing to act." Id.  The relevant test is "whether a state actor's behavior constituted an affirmative act, and, if so, whether the affirmative act created a foreseeable opportunity for harm." Id. at 283 n.7.  The fourth element also requires "a direct causal relationship between the affirmative act and plaintiff's harm." Phillips, 515 F.3d at 236.

In Walter v. Pike County, Pa., 544 F.3d 182, 194-95 (3d Cir. 2008), the court recently explained that delay on the part of a state actor is generally not an affirmative act upon which to premise a state-created danger claim.  In Walter, Joe Stacy had sexually assaulted Michael Walter's daughters.  Mr. Walter participated in the arrest of Stacy, and was to be a government witness at Stacy's trial.  While on pretrial release, Stacy began stalking the Chief of Police, who arranged for police protection to catch Stacy stalking him.  Stacy, however, did not reappear at the Police Chief's office.  Defendants then sought to revoke Stacy's bail, but were unsuccessful.

Mr. Walter was not informed of these matters, and was shot and killed by Stacy several days later.  Mr. Walter's widow and children sued the Chief of Police, the District Attorney, and an Assistant District Attorney, alleging that they created the danger to Mr. Walter by failing to warn him that Stacy had been stalking the Chief of Police.  Holding that plaintiffs could not show an affirmative use of authority that created the danger to Mr. Walter, the court of appeals explained:

> While "the line between action and inaction may not always be clear," here the Walters' allegations about the period leading up to Stacy's July, 2002 trial undoubtedly fall on the side of inaction. The Walters allege in their Amended Complaint that after Stacy began exhibiting threatening behavior, Mitchell, DeSarro, and Jacobs made conscious decisions not to re-arrest Stacy, not to seek revocation of his bail, and not to warn Michael Walter or arrange protection for him, and that those decisions shock the conscience.  We have squarely held that "failing to more expeditiously seek someone's detention," and failing to arrest someone who poses a threat, are not themselves affirmative uses of authority within the meaning of the state-created danger doctrine. Bright, 443 F.3d at 284; Burella v. City of Phila., 501 F.3d 134, 147 (3d Cir.2007). We have also held that a state actor's assurance to a plaintiff that he had "nothing to worry about and that he [was] fine," when in fact the plaintiff was quite ill and required emergency care, did not amount to an affirmative use of state authority because it did not restrain the plaintiff from acting on his own behalf to obtain private assistance. Ye v. United States, 484 F.3d 634, 641 (3d Cir.2007); id. at 642 ("assurances of well-being are not 'affirmative' acts within the meaning of the fourth element of a state-created danger claim"). If a state-created danger claim cannot be predicated on a failure to arrest, neither can it be predicated on a failure to provide protection. See, e.g., Bright, 443 F.3d at 284 ("mere 'failure to protect an individual against private violence' does not violate the Due Process Clause" (quoting DeShaney, 489 U.S. at 197)). And if an assurance of well-being despite the presence of a threat is not a sufficiently affirmative act, neither is the mere failure to warn of a threat.

Id. at 194-195.

The rationale of Walter compels rejection of the state-created danger claim presented

22

here.  See, e.g., Burella v. City of Phila., 501 F3d 134, 147 (3d Cir. 2007) (failure to enforce restraining orders designed to protect plaintiff did not constitute affirmative exercise of state authority); Bright, 443 F.3d at 284 (refusing to find liability under the Fourteenth Amendment for allegations that the probation officer failed to act promptly in waiting ten weeks before scheduling a probation revocation hearing after personally witnessing the defendant in violation of his probation). Delaying the execution of a bench warrant and indirect criminal contempt capias are not, as a matter of law, affirmative exercises of state authority.  Nor did the postponement of Ms. DeWitt's plea hearing constitute an affirmative exercise of state authority. The failure to rectify the conflict of interest created by Defendant Fellerman's representation of Ms. DeWitt in a related civil action also does not amount to an affirmative exercise of state authority.

Plaintiffs nonetheless assert that Defendants created the danger or enhanced Ms. DeWitt's vulnerability, relying on Caldwell v. City of Louisville, 120 F. App'x 566 (6th Cir. 2005). In Caldwell, Rebecca Caldwell reported to the Louisville Police Department ("LPD") that she had been physically assaulted by her live-in boyfriend, Benjamin Mills, on two occasions.  After the second instance, Ms. Caldwell was escorted to the LPD office, where she initiated a complaint against Mills.  Id. at 568.  Detective Mary Lett then hand-carried a warrant to a local prosecutor. Id.  While Lett processed the warrant, her partner, Susan Fisher, attempted to obtain an emergency protective order against Mills, but Rebecca refused to fill out the necessary paperwork.  Id.  Mills was arrested, and upon being advised of his arrest, Rebecca claimed that

23

she did not call the police or play any part in his arrest.  Id.  Rebecca filed an internal affairs complaint against Lett and Fisher, contending the two officers "over executed their authority when she was (1) transported by them to the City's Fifth District police headquarters against her will, (2) denied an opportunity to call her mother, (3) coerced to sign documents against her will, and (4) forced to swear out a warrant against Mills." Id. at 568-69.  The following day, Mills was released on bond.  Id. at 569.  The County appealed his release, and won; thus another warrant was issued for his arrest.  Id.  Due to the pending investigation instigated by Rebecca's internal affairs complaint, Office Lett refused to serve the arrest warrant.  While the arrest warrant was still being processed, which lasted at least six days, Mills fatally attacked Rebecca.  Id.

Christy Caldwell, the Mother and Administratrix of the Estate of Rebecca Caldwell, brought an action under the Substantive Due Process Clause of the Fourteenth Amendment "state created danger doctrine."  The district court dismissed the action, but the Court of Appeals reversed, finding that the City of Louisville undertook affirmative conduct which ultimately increased Rebecca's risk of harm.  Id. at 573.  The Court of Appeals reasoned that, viewing the evidence in light most favorable to Christy Caldwell and taking the allegations as true, the state took some affirmative conduct through the two police officers, who allegedly forced Rebecca to accompany them to the LTD office to process paperwork for the first arrest warrant.  Id.  The court emphasized the evidence supporting this allegation – Rebecca's refusal to fully cooperate

with law enforcement authorities and her complaint against Lett and Fisher.[11]  Id.

Our Court of Appeals likewise found sufficient pleading of affirmative conduct undertaken by state actors in Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008).  In Phillips, Michael Michalski, a  911 Call Center dispatcher for Allegheny County, ran multiple searches on the 911 Call Center's computer network and databases in an attempt to locate his former girlfriend, Gretchen Ferderbar, and her then-boyfriend, Mark Phillips.  Id. at 228.  Michalski's supervisor, Daniel Nussbaum, became aware of the his actions and placed him on a one-week suspension, which did not take effect until the next week.  Id.  The day before his suspension was to start, Michalski again searched for information regarding Mark Phillips without authorization.  Id. at 229.  He specifically accessed Mark Phillips' motor vehicle and license plate registrations.  Id.  While serving his suspension, Michalski made several telephone calls to the 911 Call Center and spoke with Danielle Tush and Brian Craig.  Id.  He requested information that would assist him in locating Mark Phillips.  Id.  Tush and Craig assisted him, fully aware that they were accessing unauthorized personal information.  Id.  Gretchen Ferderbar later contacted Nussbaum to inform him that Michalski had accessed the computer system and located Mark Phillips' residence.  Id.  Nussbaum then met with Michalski at the 911 Call Center.  Id.  Michalski

---

[11]On remand, the district court again granted summary judgment in favor of Defendants based upon Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005), which was handed down shortly after the remand.  See Caldwell v. Louisville, 200 F. App'x 430 (6th Cir. 2006).  On appeal, the Sixth Circuit again reversed the district court, concluding that Castle Rock did not address the state-created danger doctrine.  Id. at 434.

admitted he had accessed the information, and Nussbaum terminated him from his employment. Id. Nussbaum noticed Michalski appeared volatile and called the police and Ferderbar to warn them. Id. The same day of his termination, Michalski contacted Tush and Craig at the 911 Call Center and explained he had nothing to live for and that Ferderbar and Mark Phillips were going to pay for putting him in his present situation. Id. Tush and Craig did not warn anyone involved, and later that day Michalski shot and killed Mark Phillips, Ferderbar and Ferderbar's sister. Id. Jeanne Phillips, as Administratrix of her son's estate, brought suit against Allegheny County, Tush, Craig, and others, alleging violations of the Due Process Clause of the Fourteenth Amendment. Id. at 235.

Our Court of Appeals, in considering the requirement of an affirmative act for a state-created danger claim with respect to Tush and Craig, reversed the district court's dismissal of the action and found that "the complaint adequately alleges [defendants Tush and Craig] acted affirmatively by providing Michalski with confidential 911 computer information about Mark Phillips that permitted Michalski to harm him." Id. at 236. The court explained: "[I]t is reasonable to infer that Michalski could have gained relevant information at Mark Phillips' house as to his whereabouts, which could have directly assisted Michalski in stalking and killing him." Id. at 237.

The alleged affirmative conduct by state actors that existed in Caldwell and Phillips is not present in the case at bar. There are no allegations that the state forced Ms. DeWitt to testify against Mr. Fink, seek a PFA order, or bring a civil lawsuit against him. Nor is it alleged that

Defendants provided information to Mr. Fink to assist him in locating Ms. DeWitt.  Instead,

Plaintiffs complain about delay in processing criminal charges and in effecting the arrest of

Fink.[12]  In this regard, the claim in this case is similar to that rejected by our Court of Appeals in

Phillips.  In Phillips, the plaintiff alleged that a supervisor should be held liable because he

delayed Michalski's employment suspension, with full knowledge that Michalski was using Call

Center computers to obtain confidential information to determine Mark Phillips' whereabouts.

The Court of Appeals ruled that the delay in suspension was not an affirmative exercise of

authority upon which to base a substantive due process state-created danger claim, explaining:

> This misuse of Nussbaum's authority, Phillips alleges, worked to Mark Phillips'
> detriment by exposing him to a continuing danger, and by allowing Michalski to
> harm Mark Phillips. Phillips' difficulty, however, is that these allegations, at their
> core, are omissions, not commissions-inactions rather than actions. To be sure, it
> has been sufficiently alleged that Nussbaum's performance worked to Mark
> Phillips' detriment in terms of exposure to danger. But, that is only a portion of our
> test.

Id. at 236.

In sum, the state cannot be held liable under the Constitution for a danger it did not

create.  While the events complained of are tragic, Defendants did not exercise authority in such

a way as to create the danger or make Ms. DeWitt more vulnerable to attack by Fink.  Plaintiff

_____

[12]It is significant that Fink was at liberty for more than six months before he committed the
murder.  Without deciding the issue, it is worth noting that there does not appear to be a fairly
direct relationship between the delay in processing the charges against Ms. DeWitt and the fatal
assault by Fink.

may pursue claims under state tort law, but any shortcoming in that law cannot be remedied by converting tortious conduct into the denial of substantive due process.  See Brozusky ex rel. Brozusky v. Hanover Township, 222 F. Supp. 2d 606, 616 (M.D. Pa. 2002).

B.  Other Constitutional Claims

Plaintiffs assert a litany of constitutional claims, invoking the Eighth Amendment, the First Amendment right to petition the Government for a redress of grievances, the Privileges and Immunities clause of Article Four, the Fourteenth Amendment right to access the courts, the Fourth Amendment right against unreasonable searches and seizures, the Sixth Amendment right to a speedy trial, the right to familial relations under the First and Fourteenth Amendments, and the right to travel under the Privileges and Immunities Clause.  None has merit.

The Eighth Amendment protects those convicted of a crime and only applies after the State has complied with the traditional guarantees associated with criminal prosecution.  Whitley v. Albers, 475 U.S. 312, 318 (1986); see DeShaney, 489 U.S. at 199.  Ms. DeWitt was not incarcerated or convicted of a crime at the time the alleged constitutional violations took place.[13] Thus, the Eighth Amendment protections are not implicated.[14]

---

[13]Plaintiffs' proposed Second Amended Complaint deletes the Eighth Amendment claim. (Dkt. Entry 68-3 at 32-33.)

[14]At Oral Argument, Plaintiff indicated that he would no longer be pursuing a Fourth Amendment claim against Defendants.  (Oral Argument Tr., Dkt. Entry 72, at 15.)  Accordingly, the Court will not consider this claim.

Plaintiffs allege Ms. DeWitt was not provided the right to plead guilty or to have her case timely adjudicated in violation of the First Amendment, Privileges and Immunities Clause, and Fourteenth Amendment.  The Supreme Court has recognized that the constitutional right to access the courts "has been found in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses."  Gibson v. Supt. N.J. Dept. of Law, 411 F.3d 427, 441 (3d Cir. 2005) (citing Christopher v. Harbury, 536 U.S. 403, 415 n.12 (2002)).  A plaintiff may bring a suit for denial of the right to access the courts for claims arising from the "'loss or inadequate settlement of a meritorious case, . . . the loss of an opportunity to sue, . . . or the loss of an opportunity to seek some particular order of relief.'"  Id.  (quoting Christopher, 536 U.S. at 414).  Plaintiffs do not allege the loss of an opportunity to file a lawsuit or the loss of opportunity to seek relief.  Instead, Plaintiffs are complaining of an alleged delay in scheduling, which is not a proper claim under the constitutional right to access the courts.  Moreover, any causal relationship between the delay in her court proceedings and Ms. DeWitt's murder is too attenuated to support a claim for relief based upon an alleged violation of the right to access the courts.

The Sixth Amendment "affords individuals rights to a speedy trial, to an impartial jury, to know the nature and cause of a criminal accusation, to be confronted with the witnesses against them, and to effective assistance of counsel."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782,

792 (3d Cir. 2000).  "The primary purpose of this right is not to prevent prejudice to the

defendant's ability to present a defense, but rather to 'minimize the possibility of lengthy

incarceration prior to trial, to reduce the . . . impairment of liberty imposed on an accused while

released on bail, and to shorten the disruption of life caused by arrest and the presence of

unresolved criminal charges.'"  Washington v. Sobina,  475 F.3d 162, 165 (3d Cir. 2007) (citing

United States v. MacDonald, 456 U.S. 1, 8 (1982)).  A sentence is part of the trial for purposes of

the Sixth Amendment.  United States v. Campisi,  583 F.2d 692, 694 (3d Cir. 1978).

Plaintiffs complain that Ms. DeWitt did not have the opportunity to plead guilty, thereby

prolonging her pretrial restrictions, or have a timely adjudication, thus violating her right to a

speedy trial or adjudication.  The Supreme Court has identified four factors to be weighed when

analyzing whether there has been a violation of a defendant's right to a speedy trial:  the length

of the delay, the reasons for the delay, whether and when the defendant expressly asserted his

or her Sixth Amendment rights, and whether the defendant was prejudiced as a result of the

delay.  Campisi, 583 F.2d at 694 (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).  Here, the

length of the delay, under one year, is not unusually suggestive of a violation; it is not alleged

that Ms.DeWitt asserted her Sixth Amendment rights (she allegedly requested to be allowed to

move to Florida, but it is not alleged she requested to have her plea hearing scheduled for an

earlier time); and Plaintiffs do not allege that Ms. DeWitt's criminal defense was prejudiced by

the delay in scheduling.  Although the state allegedly caused the delay because of a conflict of

interest and is alleged to have failed to inform Ms. DeWitt of the reasons for the delay, in weighing all the factors, it cannot be said that Ms. DeWitt's right to a speedy trial was violated. Moreover, there is no direct causal relationship between any alleged violation of speedy trial rights and Ms. DeWitt's murder.[15]

Finally, Plaintiffs claim that Ms. DeWitt's constitutional right to travel was violated as a result of the restrictions contained in her bail bond. "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law . . . the proper inquiry is whether those conditions amount to punishment of the detainee." Bell v. Wolfish, 441 U.S. 520, 535 (1979). "Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty." Gerstein v. Pugh, 420 U.S. 103, 114 (1975). Plaintiff's pretrial restrictions were not so significant as to amount to a punishment under the Due Process Clause.[16]

C.  Monell Claims

Plaintiffs assert Monell claims against Mr. Lupas and Luzerne County, arguing that certain policies and customs implemented by Mr. Lupas precluded the plea hearing from taking

---

[15]Plaintiffs' proposed Second Amended Complaint deletes the Sixth Amendment speedy trial claim. (Dkt. Entry 68-3 at 36-37.)

[16]With respect to Plaintiffs' claim for interference with familial relations under the First and Fourteenth Amendments, Defendants argue that the interference was caused by Mr. Fink's conduct, and not the state's. (Defs.' Br. Supp. Mot. Dismiss, Dkt. Entry 21, at 16 n.4.) Plaintiffs do not respond to this argument in their opposition brief, and are deemed to have abandoned it.

place, prevented Ms. DeWitt from seeking safe haven for an extended period, and deliberately

obstructed the issuing of a bench warrant and criminal contempt capias.  Defendants contend

that the requisite causal nexus between the delay in scheduling the plea hearing and Ms.

DeWitt's death is lacking.  (Defs.' Br. Supp. Mot. Dismiss, Dkt. Entry 21, at 23-24.)

A municipality is liable for a constitutional tort "when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts a specific injury . . . ."  Robinson v. City of Pittsburgh, 120 F.3d

1286, 1295 (3d Cir.1997) (quoting Monell, 436 U.S. at 658).  But a "municipality may not be held

liable for a constitutional tort under § 1983 on the theory of vicarious liability."  Beck v. City of

Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  A policy is made when a "decisionmaker

possess[ing] final authority to establish municipal policy with respect to the action issues an

official proclamation, policy, or edict."  Id.  (citations omitted).  A municipality may also be liable

for failure to train subordinate officers when the "failure amounts to 'deliberate indifference' to the

rights of persons with whom those employees will come into contact."  Carter v. City of Phila.,

181 F.3d 339, 357 (3d Cir.1999).

As in all § 1983 claims, a municipality's liability depends upon the occurrence of a

constitutional deprivation.  Hilborn v. Cordaro, No. 3:CV-06-0223, 2007 WL 2903453, at *6 (M.D.

Pa. Sept. 28, 2007) (citing Godshalk v. Borough of Bangor, No. Civ. A. 03-1465, 2004 WL

999546, at *15 (E.D. Pa. May 5, 2004)).  Because there is no constitutional violation in this

32

action, the <u>Monell</u> claims will be dismissed.[17]

D.  State Law Claims

"[W]here the claim over which the district court has original jurisdiction is dismissed

before trial, the district court must decline to decide the pendent state claims unless

considerations of judicial economy, convenience, and fairness to the parties provide an

affirmative justification for doing so." <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d

Cir. 1995)  "Needless decisions of state law should be avoided both as a matter of comity and to

promote justice between the parties . . . .  Certainly, if the federal claims are dismissed before

trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed

as well." <u>Id.</u>  Because the federal claims will be dismissed and none of the above considerations

warrant deciding the pendent state law claims, the court will decline to exercise supplemental

jurisdiction over the state law claims.

---

[17]Even if a constitutional violation was present, Plaintiffs' <u>Monell</u> claims would not proceed because, as noted above, the causal link between Defendants' conduct and Ms. DeWitt's fatal attack is too tenuous.  <u>See</u> <u>Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Medical Servs. Training Inst.</u>, 318 F.3d 473, 482 (3d Cir. 2003) ("A municipality may be held liable if a constitutional violation <u>was caused</u> by action taken pursuant to a municipal policy or custom." (Emphasis added.)

III.  CONCLUSION

For the reasons stated in the foregoing memorandum, Defendants' Motion to Dismiss

(Dkt. Entry 17) will be granted.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAWN GARDNER, Individually and as          :
Administratrix of the Estate of Charlene   :
Kim Dewitt a/k/a Charlene De Witt Keller,  :
Deceased, REBECCA JANE THOMPSON,           :
Custodian and Next Friend on behalf of     :
R.E.D.T. a Minor                           :
           Plaintiffs                 :
                                       :
    v.                   :   3:CV-07-1947
                                       :   (JUDGE VANASKIE)
LUZERNE COUNTY, LUZERNE COUNTY             :
DISTRICT ATTORNEY'S OFFICE, DAVID          :
W. LUPAS, Individually and in his Official :
Capacity as District Attorney of Luzerne   :
County, GREGORY E. FELLERMAN,              :
Individually and in his Official Capacity  :
as Luzerne County Assistant District       :
Attorney, JANE/JOHN DOE I AND II           :
Individually and in their Official Capacity :
as Assistant District Attorneys, JOHN/     :
JANE DOE III AND IV Individually and in    :
their Official Capacity as Professional    :
Personnel and Officers of Luzerne          :
County Assistant District Attorney's       :
Office, FREDERICK NICHOLS, JR.             :
Individually and in His Official Capacity  :
as Constable/Police Officer, OFFICE OF     :
THE ATTORNEY GENERAL                       :
COMMONWEALTH OF PENNSYLVANIA               :
Pharmaceuticals                            :
          Defendants             :

<u>ORDER</u>

NOW, THIS 28th DAY OF JANUARY, 2009, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Plaintiff's Motion for Leave to File a Second Amended (Dkt. Entry 68) is DENIED.

2. Defendants Luzerne County, the Luzerne County District Attorney's Office, District Attorney David W. Lupas, and Assistant District Attorney Gregory E. Fellermans' Motion to Dismiss (Dkt. Entry 17) is GRANTED.  Plaintiffs federal law claims are DISMISSED WITH PREJUDICE.  Because this Court declines to exercise supplemental jurisdiction, Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE.

3. All other pending motions are DISMISSED WITHOUT PREJUDICE.

4. The Clerk of Court is directed to mark this matter CLOSED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

2